E-FILED
Friday, 27 January, 2012 11:21:02 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| TIMOTHY BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 10-CV-3213 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

Plaintiff Timothy Brown appeals from the denial of his application for Social Security Disability Insurance Benefits and Supplemental Security Income (collectively "Disability Benefits") under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 416(i), 423, 1381a, and 1382c. This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c). Brown has filed Plaintiff's Motion for Summary Judgment or Remand (d/e 12), and Defendant Commissioner of Social Security has filed a Memorandum in Support of Motion for Summary Affirmance (d/e 15).[1] The parties consented, pursuant to 28 U.S.C. § 636(c), to have this matter proceed

---

[1]The Court treats the Commissioner's Memorandum as a request for summary judgment. See Local Rule 8.1(D).

before this Court.  Consent to Proceed Before a United States Magistrate Judge, and Order of Reference entered January 20, 2011 (d/e 9).  For the reasons set forth below, the Decision of the Commissioner is affirmed.

## STATEMENT OF FACTS

Brown was born on July 8, 1971.  He completed the tenth grade. Brown suffers from human immunodeficiency virus (HIV).  Answer (d/e 6), attached Certified Transcript of Proceedings before Social Security Commission (R.), 32-33, 111, 284.  He has worked as a cook, hand packager, stocker, order picker and airport aide.  R. 32, 45, 121, 174, 218.

On August 5, 2005, blood tests showed that Brown had a CD4 count of 191, a viral load of 4,300, and a log value of 3.6.  R. 318, 329, 355-56. CD4 cells decrease as HIV progresses.  Viral loads of 40 to 500 are considered low.  See Commissioner's Memorandum, at 2-3 n. 2-5 and authorities cited therein.  On October 5, 2005, Brown saw Dr. Janak Koirala, M.D.  Brown had no complaints.  The examination was unremarkable.  Based on the earlier blood tests, Dr. Koirala prescribed antiretroviral therapy.  R. 329.

On January 20, 2006, Brown saw Dr. Koirala again complaining of itching skin lesions.  R. 255, 347.  Blood tests showed a CD4 count of 207 and a viral load of 5940.  Brown had not been compliant in taking his medication.  Brown saw Dr. Koirala again on May 25, 2006.  Brown had a

CD4 count of 157, and a viral load of 3290.  R. 342, 346.  At Brown's June 16, 2006, appointment, Dr. Koirala noted that Brown had some fatigue, but was doing well and was asymptomatic.  R. 254, 336.

On September 11, 2006, a state agency psychologist, Dr. Kirk Boyenga, Ph.D., stated there was insufficient evidence to complete a psychiatric review.  R. 261.  On September 12, 2006, state agency physician Dr. Frank Norbury, M.D., completed a Physical Residual Capacity Assessment.  Dr. Norbury opined that Brown could occasionally lift twenty pounds; frequently lift ten pounds; stand or walk for two hours in an eight-hour day; sit six hours in an eight-hour day; and had no limitations on his ability to push, pull and operate foot controls.  R. 276.  Dr. Norbury opined that Brown could occasionally climb, balance, stoop, kneel, crouch, or crawl.  Dr. Norbury opined that Brown should avoid concentrated exposure to extreme cold and heat, humidity, and fumes, and should avoid even moderate exposure to hazards.  R. 279.  Dr. Norbury noted that Brown's HIV was asymptomatic, but also noted that Brown exhibited severe fatigue.  R. 282.  Dr. Norbury explained that, "Above limitations due to the claimant's fatigue which is usually one of the symptoms from HIV."  R. 277.  Dr. Norbury further stated that Brown's claims of fatigue "are credible considering his status of HIV."  Dr. Norbury concluded, "He,

however, retains the physical capacity to perform work activity within the restrictions noted on this RFC."  R. 281.

On June 8, 2007, Brown saw Dr. Koirala again.  Tests showed a CD4 count of 246 and a viral load of 5860.  R. 326-29, 340, 360.  Dr. Koirala noted that Brown was not taking his antiretroviral medication.  Dr. Koirala recommended restarting his medication.  R. 340, 360.

On July 12, 2007, Brown underwent a psychological consultative examination by Dr. Dolores Trello, Psy. D.  R. 284-88.   She diagnosed Brown with adjustment disorder, depressed mood associated with being HIV positive, and generalized anxiety disorder.  Dr. Trello assessed Brown with having a Global Assessment of Functioning (GAF) of 50, and opined that Brown had serious impairment in vocational and interpersonal functioning.  R. 287.  Dr. Trello further opined that Brown was not able to handle his own funds due to fatigue and poor arithmetic skills.  R. 288.

On July 16, 2007, agency physician Dr. Virgilio Pilpapil, M.D., performed a second Physical Residual Functional Capacity Assessment of Brown.  R. 289-96.  Dr. Pilpapil opined that Brown could occasionally lift fifty pounds; frequently lift twenty-five pounds; stand or walk for two hours in an eight-hour day; sit six hours in an eight-hour day; and had no limitations on his ability to push, pull and operate foot controls.   R. 290. Dr. Pilpapil opined that Brown had no postural limitations (crawling,

crouching, balancing, stooping, kneeling or climbing) but needed to avoid concentrated exposure to extreme heat and cold, noise, vibration, and hazards.  R. 291, 293.  Dr. Pilpapil noted that Brown's physical examination was unremarkable except for a rash, and that Brown was asymptomatic for opportunistic diseases.  R. 290.

On July 26, 2007, Dr. Donald Cochran, Ph.D., performed a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment.  R. 297-314.  He stated that Brown suffered from affective disorders and anxiety-related disorders.  He opined that as a result of these disorders, Brown had moderate restrictions on his activities of daily living; moderate difficulties maintaining social functioning; and moderate difficulties maintaining concentration persistence, or pace; but no episodes of decompensation.  R. 307.  Dr. Cochran opined that Brown "retains the mental capacity to do simple work related tasks in the context of SGA."  R. 309.[2]  Dr. Cochran opined that Brown was moderately limited in his ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) perform activities within a schedule, maintain regular attendance and be punctual; (5) and interact appropriately with the general public.  R. 310-12.

---

[2]SGA stands for substantial gainful activity.

Dr. Koirala saw Brown in August, September, November, and December 2007.  In August, his CD4 count was 133 and his viral load was 7550.  Brown was not compliant with his medication.  Brown started taking his medication and by November 2007, his CD4 count was 204, and his viral load was less than 50.  R. 322-23, 358-59, 384-85, 381-82.  On December 17, 2007, Dr. Koirala noted that Brown's HIV infection was stable, but he was still suffering from chronic pain.  R. 382.

On January 9, 2008, Dr. Ernst Bone, M.D.,conducted another Physical Residual Functional Capacity Assessment.  R. 366-75.  Dr. Bone opined that Brown could occasionally lift twenty pounds; frequently lift ten pounds; stand or walk for two hours in an eight-hour day; sit six hours in an eight-hour day; and had no limitations on his ability to push, pull and operate foot controls.  R. 367.  Dr. Bone opined that Brown had no postural limitations and no environmental limitations (e.g., heat, cold, fumes, noise, hazards).  R. 368, 370.  Dr. Bone noted that Brown was "non-compliant with his meds. fatigue."  R. 373.  On January 11, 2008, agency psychologist Dr. Carl Hermsmeyer, Ph.D., affirmed Dr. Cochran mental assessment of Brown.  R. 374.

Brown continued to see Dr. Koirala throughout 2008 and 2009.  Throughout this time, his viral load remained below 500 and his CD4 count varied from 162 to 326.  R. 397-407.

On May 5, 2008, Dr. Koirala completed a Medical statement regarding HIV and AIDS for Social Security disability claim (Medical Statement).  R. 390-92.  Dr. Koirala indicated that Brown was suffering from weakness and side effects of his medication.  Dr. Koirala stated, "Pt. is having difficulty with fatigue & weakness which he says causes him to need to rest every 30 minutes when active."  R. 391.  The Medical Statement asked several questions regarding physical and mental limitations.  Dr. Koirala did not answer any of these questions.  Rather, Dr. Koirala stated, "Pt. will need a Psychiatric Evaluation & Rehabilitation Evaluation to answer questions . . . ."  R. 392.

The Administrative Law Judge (ALJ) conducted an evidentiary hearing on August 31, 2009, by teleconference.  Brown appeared in person and with his attorney in Springfield, Illinois.  That ALJ and vocational expert Ron Malik were in Peoria, Illinois.  Brown and Malik testified at the hearing. R. 28.

Brown testified that he lived in an apartment with a friend, his sixteen year old son, and his friend's ten year old child.   He last worked in June of 2009 as a receptionist.  He worked about four hours per day, four days a week.  R. 30-33.

Brown testified that his medications were somewhat effective, but caused tiredness, dizzy spells and problems with his bowels.  R. 34.

Brown testified that he had no trouble sitting, could stand an hour to an hour and a half, walk two blocks, lift sixty to seventy pounds once a day; lift fifty pounds once in a day; lift twenty pounds, but not all day; and could lift ten pounds all day.  R. 36.  Brown stated that he had trouble climbing stairs.  R. 36-37  He said that he had no trouble pulling or pushing with his hands and arms.  R. 37.

Brown testified that he could take care of his personal hygiene and dress himself and feed himself.   He stated that he could only prepare simple meals because he could not stand over a stove for long.  R. 37-38. He stated that he did not do his own laundry or make the bed.  He washed dishes once in a while and did some vacuuming, dusting, mopping and sweeping.  He stated that he had to rest his back after about thirty minutes of housework.  R. 38.

On examination by his attorney, Brown testified that if he was required to lift and carry ten pounds frequently, he would need to take breaks every other hour or so.  R. 39.  Brown testified that his heart would begin to beat too fast and he would need to sit down and calm down a little bit.  Brown stated that these breaks would need to be for twenty to twenty five minutes.  R. 39.  Brown testified that his doctor told him not to move too fast and to sit down if he needed to do so.  Brown stated that his

medications slowed him down and caused stomach problems.  R. 40.

Brown also testified that he was depressed and suffered from fatigue.

R. 41.

> Malik then testified.  The ALJ posed a hypothetical question,
>
> Okay, well, Mr. Malik, I'd like you to assume we have an individual the same age, education, and experience as the claimant.  The individual is limited to light work, limited to occasional contact with the public, co-workers, and supervisors; limited to tasks that require little change in the job process; and needs the flexibility to meet daily quotas a opposed to hourly quotas.  Now, would these restrictions affect the performance of claimant's past relevant work?

R. 47.  Malik testified that such a person could not perform Brown's past

relevant work, but could perform other jobs.  Malik listed several jobs,

> They would include DOT 323.687-014, housekeeping, 17,800 positions in Illinois, 454,007 positions in the national economy; DOT 920.687-126, a labeler/stamper, 10,700 in Illinois, 90,300 in the national economy.

R. 47.  Malik stated that these jobs were a representative sample of the

jobs that such a person could perform.  R. 48.

> The ALJ then asked Malik to assume the same person limited to

sedentary work with the other quoted restrictions.  Malik opined that such a

person could perform jobs in the national economy,

> They would include DOT 249.587-018, document prep. clerk, 2,200 in Illinois, 31,900 in the national economy; DOT 209.587-010, an addressor, 2,200 in Illinois, 91,200 in the national economy; DOT 731.687-014, a finisher, 1,700 positions in

Illinois, 13,400 nationwide.  That would be representative, Your
Honor.

R. 48.

The ALJ asked Malik to assume that the person was less than eighty
percent productive on a job for any reason, either working slowly or taking
additional breaks or any other reason.  Malik opined that such reduced
productivity would eliminate all jobs.  R. 48.  Malik also opined that if the
person would need to take twenty minute breaks every hour, or five minute
breaks every thirty minutes, then the person would not be able to perform
any employment.  R. 49.  The ALJ then concluded the hearing.

THE DECISION OF THE ALJ

The ALJ issued his opinion on September 21, 2009.  R. 14-25.  The
ALJ followed the five-step analysis set forth in Social Security
Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.
Step 1 requires that the claimant not be currently engaged in substantial
gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2
requires the claimant to have a severe impairment. 20 C.F.R. §§
404.1520(c), 416.920(c).  If true, Step 3 requires a determination of
whether the claimant is so severely impaired that he is disabled regardless
of the claimant's age, education and work experience.  20 C.F.R. §§
404.1520(d), 416.920(d).  The listings of such severe impairments are set

forth in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  The claimant's

condition must meet the criteria in a Listing or be equal to the criteria in a

Listing.  20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not so severely impaired, then Step 4 requires the

claimant not to be able to return to his prior work considering his Residual

Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e), 416.920(e).  If the

claimant cannot return to her prior work, then Step 5 requires a

determination of whether the claimant is disabled considering his RFC,

age, education, and past work experience.  20 C.F.R. §§ 404.1520(f),

416.920(f).  The claimant has the burden of presenting evidence and

proving the issues on the first four steps.  The Commissioner has the

burden on the last step; the Commissioner must show that, considering the

listed factors, the claimant can perform some type of gainful employment

that exists in the national economy.  Taylor v. Barnhart, 425 F.3d 345, 352

(7th Cir. 2005); Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995).

The ALJ found that Brown met his burden at Steps 1 and 2.  Brown

had not engaged in substantial gainful activity since he applied on April 27,

2007, and he suffered from severe impairments of HIV, anxiety disorder,

and affective disorder (depression).  R. 19.  At Step 3, the ALJ found that

none of his impairments were severe enough to meet or equal a Listing.

At Step 4, the ALJ found that Brown had the RFC to perform light work except that he was limited to (1) occasional contact with the public, co-workers, and supervisors; (2) tasks that require little change in the job process; and (3) tasks that have the flexibility to meet daily quotas rather than hourly quotas.  R. 21.  The ALJ stated that no treating or examining physician opined that Brown was disabled or had limitations greater than those determined in the decision.

The ALJ found that Brown's testimony about the severity of his impairments was not credible.  The ALJ noted inconsistencies in his testimony.  The ALJ noted that Brown stated at one point that he could only stand for thirty minutes, but testified at the hearing that he could stand for ninety minutes or so.  The ALJ also noted that Brown testified at one point that he could lift sixty to seventy pounds once a day, fifty pounds once, twenty pounds some of the day, and ten pounds all day.  R. 22.  The ALJ found that the evidence about Brown's activities of daily living was limited, but still showed a wide range of activities including light housework, some cooking, and some laundry.  R. 23.  The ALJ found that these inconsistencies, along with the medical evidence, rendered Brown's testimony regarding the severity of his limitations to not be credible.  R. 23.

After determining the RFC, the ALJ found at Step 4 that Brown did not have past relevant work.  At Step 5, the ALJ found that Brown could

perform a significant number of jobs in the national economy.  The ALJ

relied on Malik's testimony and the Medical-Vocational Guidelines, 20

C.F.R. Part 404, Subpart P, Appendix 2.  R. 24.  The ALJ stated that Malik

testified that his testimony was consistent with the information contained in

the Department of Labor's *Dictionary of Occupational Titles* (DOT).  R. 24.

Based on his findings, the ALJ concluded that Brown was not disabled.

R. 25.

Brown appealed to the Appeals Council.  On April 29, 2010, the

Appeals Council denied Brown's request for review.  R. 1.  Brown then filed

this action for judicial review.

## ANALYSIS

This Court reviews the ALJ's Decision to determine whether it is

supported by substantial evidence.  In making this review, the Court

considers the evidence that was before the ALJ.  Wolfe v. Shalala, 997

F.2d 321, 322 n.3 (7th Cir. 1993).  Substantial evidence is "such relevant

evidence as a reasonable mind might accept as adequate" to support the

decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  This Court

must accept the ALJ's findings if they are supported by substantial

evidence, and may not substitute its judgment for that of the ALJ.  Delgado

v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the

credibility determinations of the ALJ unless the determinations lack any

explanation or support in the record.  Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008).  The ALJ must articulate at least minimally his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994). The Court must be able to "track" the analysis to determine whether the ALJ considered all the important evidence.  Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995).

The ALJ's decision is supported by substantial evidence.  The opinions of Drs.  Norbury, Pilpapil, and Bone support the ALJ's finding that Brown could perform light work.  Drs. Pilpapil and Bone also found no postural limitations and Dr. Bone found no environmental limitations. Brown also testified that he could lift ten pounds all day long.   This evidence all supports the ALJ's RFC exertional findings at Step 4.  Dr. Cochran's opinions that Brown had moderate limitations in social functioning supported the ALJ's RFC limitations with respect to limited contact to the public, co-workers, and supervisors, and to the need for flexibility to complete tasks on a daily basis.  The opinions of vocational expert Malik support the finding at Step 5 that Brown could perform a significant number of jobs in the national economy.

Brown argues that the ALJ erred in not addressing Dr. Koirala's opinions.  The Court disagrees because Dr. Koirala declined to express any opinions.  Dr. Koirala related Brown's statement that Brown had to rest

every thirty minutes, but did not opine that Brown needed such rest.
Dr. Koirala further refused to answer any questions about Brown's
limitations.  Dr. Koirala's medical evidence is consistent with the ALJ's
findings.

Brown argues that Dr. Norbury opined that Brown was limited to
sedentary work.  This is factually incorrect.  Dr. Norbury opined that Brown
could lift twenty pounds occasionally and ten pounds frequently.  R. 276.
These limitations are consistent with light work, not sedentary work.  20
C.F.R. §§ 404.1567(b), 416.967(b).  Dr. Norbury's opinions are consistent
with the ALJ's finding that Brown could perform light work.

Brown argues that the ALJ erred because he did not include any
postural or environmental limitations in the RFC.  The Court disagrees.  Dr.
Bone's opinions support the conclusion that Brown had no environmental
limitations, and Drs. Bone and Pilpapil's opinions support the conclusion
that Brown had no postural limitations.  These opinions provide substantial
evidence to support the ALJ's decision not to include such limitations in the
RFC.

Brown argues that the ALJ erred in finding only moderate limitations
in social functioning and a need for limitations in regards to changes and
job quotas.  Brown argues that Dr. Trello's finding of a GAF score of 50
required a finding of more severe limitations on social functioning.  The

Court disagrees.  A GAF score reflects both the severity of a person's symptoms and functional level.  The score does not measure functional capacity.  Denton v. Astrue, 596 F.3d 419, 425 (7th Cir. 2010).  Thus, Dr. Trello's GAF score does not conflict with Cochran's opinions that Brown had only moderate limitations in social functioning.  Dr. Cochran's opinions provide substantial evidence to support the ALJ's findings.

Brown argues that the ALJ did not consider evidence of Brown's fatigue and lack of concentration.  The Court disagrees.  Drs. Norbury, Pilpapil, and Bone all opined that Brown could sit for six hours in an eight-hour work day and stand or walk for two hours.  They considered his fatigue in making these findings.  Dr. Norbury specifically stated that the limitations were based on Brown's level of fatigue.  R. 277.  Brown also testified that he could sit without any difficulty.  R. 36.  All this evidence supports the conclusion that the ALJ's RFC finding considered the evidence of fatigue.  The ALJ also considered Brown's concentration problems when he eliminated jobs that had hourly quotas from the RFC.  R. 23.  The record contains substantial evidence to support the ALJ's consideration of these matters.

Brown argues that the ALJ did not consider whether the combination of Brown's impairments rendered him disabled.  The Court again disagrees.  The ALJ expressly found that Brown's impairments or

combination of impairments did not meet a Listing at Step 3.  R. 20.  The ALJ considered the combination of impairments.

Brown asks the Court to reject the ALJ's credibility finding.  This Court will not review the credibility determinations of the ALJ unless the determinations lack any explanation or support in the record.  Elder, 529 F.3d at 413-14.  The ALJ's findings are supported by the record.  Brown testified inconsistently about his ability to lift.  He first testified that he could lift ten pounds all day long.  Later, on examination by his attorney, he stated he would need twenty to twenty-five minute breaks every other hour if he had to lift ten pounds.  He previously told Dr. Koirala that he had to sit down every thirty minutes, but he testified at the hearing that he could stand an hour to an hour and a half.  R. 36, 230, 391.  Inconsistencies such as these, plus the opinions of Drs. Cochran, Nobury, Pilpapil, and Bone support the ALJ's credibility finding.  The Court therefore will not disturb the finding.

Brown last argues that the ALJ erred by not asking Malik if his opinions were consistent with the DOT.  Brown is correct that the ALJ must ask the vocational expert whether his opinions conflict with the DOT and the Department of Labor's *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* (1993) (SCO) .  SSR 00-4p.  The ALJ failed to ask Malik about the DOT or the SCO.  This error,

however, is harmless unless the vocational expert's opinions actually conflict with the DOT.  Terry v. Astrue, 580 F.3d 471, 478 (7th Cir. 2009).

Brown argues that Malik's opinions conflict with DOT and the SCO because the fifth digit in the DOT Occupational Code Number assigned to each job listed by Malik in his testimony was the number "8."  Brown argues that this number in the sequence means that each job listed by Malik required taking instructions and helping with more than occasional interaction with others.  Plaintiff's Memorandum in Support of Motion for Summary Judgment or Remand (d/e 13), at 16.  Brown's RFC, however, limited him to only occasional contact with others.  Brown argues that Malik's opinion is, thus, inconsistent with the DOT and SCO assessment of the jobs listed by Malik because the "8" inserted as the fifth digit of the Occupational Code Number means that the job requires more than occasional interaction with others.

The Court disagrees with Brown's interpretation of the DOT and the SCO and the significance of an Occupational Code Number with a fifth digit of "8".  The DOT and SCO state that the fifth digit in each job classification number concerns how the job requires a person to relate to people.  The DOT explains that, "As a general rule, Worker Functions involving more complex responsibility and judgment are assigned lower numbers . . . while functions which are less complicated have higher numbers."  DOT, Parts of

Occupational Definitions, The Occupational Code Number, and Appendix

B, Explanation of Data, People, and Things; SCO, Appendix E,

Occupational Code Number.[3]  The number "8" is the highest number

assigned to the fifth digit placement and so indicates that the listed job has

the least complicated functions in relating to people.  The number "8"

means taking instructions–helping.  Id.  The DOT and SCO explanation of

the Occupational Code Number does not state that an "8" indicates that job

requires more than occasional interaction with others.  Brown is, thus,

incorrect and Malik's opinions are not inconsistent with the DOT and SCO

with respect to the Occupational Code Numbers of the jobs that he listed in

his opinions.

Brown also argues that the finisher job, referenced by Malik in his

testimony, requires meeting detailed quotas.  The job definition of a finisher

in the DOT does not so indicate.  The occupational definition states,

**731.687-014 FINISHER (fabrication, nec)**

Sets doll hair into specified style by combing, brushing,
and cutting; Places doll head on holder and combs and brushes
hair in prescribed manner to smooth and untangle hair, using
wire brush and petroleum jelly.  Cuts hair to desired length,
using scissors.  Sets hair into specified style and secures in
place, using rubber bands.  Wipes doll face to remove
smudges, using damp cloth.  Places plastic bag over finished

---

[3]The Court reviewed the DOT online on January 18-20, 2012. Dictionary of
Occupational Titles Fourth Edition, Revised 1991, available at
http://www.oalj.dol.gov/libdot.htm.

> head and tucks edges under base to prevent damage to hair
> and face.
> *GOE: 06.04.34 STRENGTH: S GED: R2 M1 L1; SVP: 2 DLU:*
> *77*

DOT, Occupational Definition 731.687-014 (emphasis in the original).[4]

The definition does not mention specific quotas.  The Court finds no

inconsistencies between Malik's opinions and the DOT or SCO.

The ALJ's  error in failing to ask Malik about the DOT, therefore, was

harmless.

---

[4] The term "nec" in the parenthetical means "not elsewhere classified".  See
DOT, Indexes, Occupational Titles Arranged by Industry Designation, Miscellaneous
Fabricated Products, Not Elsewhere Classified. The various codes in italics at the end
of the occupational definition are called the definition trailer.  See DOT Appendix C,
Components of the Definition Trailer.  As set forth in Appendix C, the GOE: 06.04.34
refers to categories in the *Guide for Occupational Exploration,* published the US
Employment Service, to provide information about the interests, aptitudes, entry level
preparation and other traits required for successful performance in various occupations.
The STRENGTH S means that the job is sedentary work.  The GED: R2 M1 L1 means
that the General Educational Development for the job would require: (1) the ability to
apply commonsense understanding to carry out detailed but uninvolved written or oral
instructions, deal with problems involving a few concrete variables in or from
standardized situations; (2) the mathematical ability add and subtract two digit numbers,
multiply and divide 10's and 100's by 2, 3, 4, 5, perform the four basic arithmetic
operations with coins as part of a dollar, and perform operations with units such as cup,
pint, and quart; inch, foot, and yard; and ounce and pound; and (3) the language skills
to recognize the meaning of 2,500 words, read at a rate of 95 to 120 words per minute,
compare similarities an differences between words and between series of numbers,
print simple sentences containing subject, verb, and object, and series of numbers,
names, and addresses, and speak simple sentences, using normal word order, and
present and past tenses.  The SVP 2 means that the Specific Vocational Preparation for
the job would be anything beyond a short demonstration up to and including 1 month's
training.  The DLU 77 refers to the Date Last Updated and means that the particular
occupation has not been studied by an analyst since publication of the 1977 edition of
the DOT.   None of the information in the Trailer indicates any requirement for quotas.

WHEREFORE, the Commissioner's request for summary affirmance is ALLOWED and Plaintiff's Motion for Summary Judgment or Remand (d/e 12) is DENIED.  The decision of the Commissioner is AFFIRMED. THIS CASE IS CLOSED.


ENTER:    January 25, 2012

                           *s/ Byron G. Cudmore*
                        BYRON G. CUDMORE
                 UNITED STATES MAGISTRATE JUDGE